UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Covington)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 2: 08-05-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| SHAWN FREEMAN, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

*** *** *** ***

Defendant Shawn Freeman ("Freeman") has moved the Court to enter a judgment of acquittal or, in the alternative, to grant a new trial under Rules 29 and 33 of the Federal Rules of Criminal Procedure. For the reasons which follow, both requests will be denied.

**I.    Evidence Supporting the Conspiracy Conviction**

In support of his request for a new trial, Freeman asserts that the United States failed to prove beyond a reasonable doubt all of the essential elements of the conspiracy charge. More specifically, Freeman asserts that the United States failed to prove that he knew of the existence of the conspiracy or that he voluntarily joined it. He asserts that the evidence against him was "scant" and that no witness actually heard Sydnor's instructions to Lanham or that Freeman acknowledged any agreement with the plan. [Record No. 97; pp. 2-3] Counsel argues that the only evidence supporting the inference that Freeman acknowledged agreement with the plan came from Bobby Wright who, according to his counsel, testified that "Shawn Freeman 'nodded

-1-

his head' when Lanham commented that Sester was to be scared, but not hurt."[1]  Although he admits that the Court has already addressed the issue of whether such acknowledgment was sufficient to support a verdict against Freeman, he asserts that this ruling was error.

In making this argument, Freeman's counsel would have the Court ignore Wright's unambiguous testimony given in response to questions posed during trial.  As Wright explained, *both* Lanham and Freeman approached his cell on the night of the assault.  Further, Wright was not the only inmate able to hear the instructions given.  After describing the type of inmates housed in Cell 101, and after describing earlier incident occurring in the adjacent cell of the Grant County Detention Center, Wright gave the following testimony concerning: (i) his knowledge that a new inmate would be placed in Cell 101; and (ii) the actions to be taken in connection with this new inmate:

> Q. And how did you learn that a new inmate was coming to your cell?
>
> A. Two officers came to the cell and asked me to come to the door.
>
> Q. Let me stop you there, so we can go through this step by step.  You say two officers came to your cell and asked you to come to the door?
>
> A. Yes, ma'am.
>
> Q. Who were those two officers?
>
> A. From [sic] Mr. Freeman and Mr. Lanham.
>
> Q. Any doubt in your mind that it was those two officers who came to your cell?
>
> A. No doubt at all.

---

[1] As the Court will explain, this characterization of Wright's testimony is incorrect.

Q. Both came to the door?

A. Yes, ma'am.

Q. And they asked to speak with you?

A. Yes, ma'am.

Q. Where were you inside the cell when they asked to speak with you?

A. I was sitting at a table, playing Scrabble.

Q. How is it that you were notified that these two officers were at the door?

A. They yelled my name, and the inmates told me that they were asking for me.

Q. Now, did you approach the door at that point?

A. Yes, I approached the door.

Q. When you did, were there other inmates gathering around that door?

A. Yes, ma'am.

Q. Approximately how many?

A. Three or four.

Q. All right. So after being told that Lanham wanted to speak with you, you go to the door?

A. Yes, ma'am.

Q. And again, when you get to the door, who do you see?

A. Mr. Lanham and Mr. Freeman.

Q. Any doubt in your mind that you saw both of them?

A. No.

Q. Were they both standing right there?

A. Yes, ma'am.

Q. Now, I want to ask you, did one or the other of them say something to you there at the doorway?

A. They said they were going to be bringing an inmate down, and they wanted me to fuck with him.

Q. They wanted you to fuck with him?

A. Yes, ma'am.

Q. All right. Now, before we get into who said what, were both Mr. Freeman and Mr. Lanham standing right there when you heard they wanted you to fuck with him?

A. Yes, ma'am.

Q. And were other inmates standing there at the door?

A. Yes, ma'am.

Q. Now, how was this conversation taking place? Was the door open? Was it closed?

A. It was closed?

Q. So what was the volume level at which you received this message to fuck with the new inmate?

A. They had to yell it through the door for me to hear it.

Q. Now, who do you remember actually saying the words "fuck with him"?

A. Mr. Lanham.

Q. Mr. Lanham?

A. Yes, ma'am.

Q. Now, where was Mr. Freeman when Mr. Lanham said this?[2]

A. Right next to him at the door.

Q. Is there any doubt in your mind that he was right there?

A. No, ma'am.

Q. What was Mr. Freeman doing?

A. They was agreeing with him, shaking his head yes, we need you to deal with this guy, because he - -

Q. Well, did Mr. Freeman object to anything Mr. Lanham said?

A. No.

Q. Did other inmates react when this was said?

A. Yes, ma'am.

Q. What was the reaction of other inmates?

A. They were celebrating, getting ready for another guy to come in. Any everyone was thinking it was going to be another child molester because they just took one out. They were yelling, screaming, we got one coming, and that sort of thing.

Q. Now, did either Lanham or Freeman try to keep these other inmates from hearing what was being said to you, meaning were they trying to be quiet?

A. No, ma'am.

Q. Was this a secret conversation?

---

[2] At page 6 of his memorandum, counsel for Freeman makes the following assertion:

Here, Shawn Freeman, at worst, heard Wesley Lanham tell Bobby Wright to "scare" Josh Sester. This evidence is capable of different meanings, perhaps, but it is not enough to prove beyond a reasonable doubt that Shawn Freeman disregarded a known risk of injury to Joshua Sester. . . .

[Record No. 97; p. 6] In light Wright's actual testimony, this argument to be specious, at best.

    A.    No, ma'am.

    Q.    Did either Mr. Lanham or Mr. Freeman say to you that they did not want this person to be hurt?

    A.    No, ma'am.

    Q.    And were Mr. Freeman and Mr. Lanham still standing there when the inmates erupted in this celebration that you just described?

    A.    Yes, ma'am.

    Q.    Was there anyway [sic] for Mr. Freeman and Mr. Lanham to miss how those inmates were reacting?

    A.    No, ma'am.

[*See* Record No. 86; pp. 73-77.]

This testimony contradicts counsel's assertion that Freeman was merely "present" when Lanham instructed Wright to "scare [Joshua Sester], but don't hurt him." The fact that both Lanham and Freeman approached Wright with instructions concerning the manner in which Seltzer was to be treated is important for several reasons. Wright was able to discount the explanation offered by Freeman that he was nodding his head simply because he was "disappointed" that Wright had been moved to Cell 101 due to his use of marijuana while incarcerated. Instead, he clearly testified that Freeman nodded in agreement with Lanham's instructions. In addition, Freeman's presence and his agreement with the instructions given by Lanham concerning Sester's treatment gave added weight to those directions (which were overheard by several other inmates according to Wright). The jury could draw the inference that the support offered by Freeman's presence and his actions in agreeing with what Lanham was saying could certainly embolden actions that might not occur if Lanham had acted alone. In

other words, while an inmate might be hesitant to take wrongful actions if instructions were given by a lone actor, when more than one guard is present, additional weight is given to the instructions. Viewed a whole, and considering all reasonable inferences which the jury was able to take from Freeman's actions, a reasonable juror could certainly conclude that he freely and voluntarily joined the conspiracy to violate Sester's civil rights by causing inmates to punish him in an unlawful and unjustified manner. In short, it is reasonable to conclude that he was a willing and active participant, and not a mere bystander as his counsel has asserted.

Counsel also argues that the United States failed to present proof establishing that Defendant Freeman had knowledge of the agreement to interfere with Joshua Sester's civil rights. With regard to this issue, he asserts that "no witness averred that Shawn Freeman actually heard Sydnor's instructions to Lanham or that Freeman acknowledged any agreement with Sydnor's plan. The testimony of Wendy Guthrie and Shawn Sydnor, however, belie this contention.

Wendy Guthrie offered the following testimony concerning the discussions in the booking area prior to the time Sester was taken to Cell 101:

    Q.    When you arrived at booking the second time, was anyone else there?

    A.    Sydnor and Powell was there, and then Syndor had radioed Lanham and Feeman.

    Q.    And did you hear that on the way?

    A.    Yes.

    Q.    And at some point, did Lanham and Freeman actually arrive up there?

    A.    Yes.

\*\*   \*\*   \*\*   \*\*   \*\*

Q. Now, you just mentioned in addition to noticing Shawn Sydnor in the conversation with Scott Allen, you saw a new arrival at the jail?

A. Yes.

\*\*   \*\*   \*\*   \*\*   \*\*

Q. Who was that person?

A. Josh Sester.

\*\*   \*\*   \*\*   \*\*   \*\*

Q. And what was Josh Sester doing? What was his demeanor?

A. He was very upset. He was shaking, crying.

\*\*   \*\*   \*\*   \*\*   \*\*

Q. And did you observe anyone – Excuse me. At the time that Sydnor told you "I want you to look at his hair," what was he doing? What was Sydnor doing?

A. He was standing next to him laughing at his hair.

Q. And was anyone else there at that time, any other deputies?

A. Yes.

Q. Who else?

A. Powell, Freeman, and Lanham and myself.

Q. So all of those people, including yourself, were present while Sydnor was making fun of Josh Sester's hair?

A. Yes.

\*\*   \*\*   \*\*   \*\*   \*\*

Q. And is there any doubt in your mind that, for instance, Mr. Freeman was standing right there while this taunting of Josh Sester was going on?

A. He was there.

\*\* \*\* \*\* \*\* \*\*

A. They were laughing.

Q. Now, what kind of comments did you hear at that time being made about Mr. Sester?

A. Sydnor was talking about his hair and how cute he was, how he's going to make a good girlfriend.

\*\* \*\* \*\* \*\* \*\*

Q. Now, what happened after you, Sydnor, Lanham, and Freeman gathered out there at the shift commander's desk?

A. We were standing there talking, Sydnor had sat down in the chair because there was a window cut out, you could see Powell still booking in Josh, and he just kept talking. And I said, you know, "You need to leave the kid alone." And then he had sent Lanham and Freeman to go find a cell to put him in.

\*\* \*\* \*\* \*\* \*\*

Q. And at some point, did Shawn Sydnor say something about housing Josh Sester?

A. Yes.

Q. What did he say?

A. He said that we needed to scare the shit out of this kid so he didn't come back.

\*\* \*\* \*\* \*\* \*\*

Q. Now, is there any doubt in your mind that Shawn Freeman was present for that part of the conversation?

A.   He was.

Q.   And what about Mr. Lanham?

A.   He was.

Q.   Now, after Sydnor said "We need to pick out a cell in order to scare this kid." what did Lanham and Freeman do?

A.   They went down 26 hall.

[See Record No. 92; pp. 124-131.]

Shawn Sydnor also described his conversations with and instructions to Defendants Lanham and Freeman on the night of the incident in question. He testified as follows with respect to this issue:

Q.   Why did you contact Defendant Lanham?

A.   So he could come up and have a look at Mr. Sester.

**   **   **   **   **

Q.   What was happening in the booking while Josh Sester was being processed in?

A.   Myself, Freeman, Lanham were all taunting him, making fun of him.

**   **   **   **   **

Q.   Beyond making fun of Josh Sester, did you have any other conversation with the defendants while Sester was being booked in?

A.   Yes, sir.

Q.   And who was present for that conversation?

A.   Deputies Lanham and Freeman.

Q.   What did you say to Defendants Lanham and Freeman?

A. That he needed to be scared and for them to find a cell.

Q. Did you specify what kind of cell?

A. No; general population.

\*\*   \*\*   \*\*   \*\*   \*\*

Q. And how certain are you that Defendants Lanham and Freeman were present in this conversation where you said that Josh should be scared and put in general population?

A. 100 percent.

Q. And why did you want Josh in general population?

A. To scare him and teach him a lesson because I was upset because he about hit my friend.

Q. Now, did you say to Defendant Lanham and Freeman how you wanted Josh to be scared?

A. No, sir, I did not.

Q. Did you tell Defendants Lanham and Freeman a reason that Josh Sester was being moved into general population?

A. To be scared, yes.

\*\*   \*\*   \*\*   \*\*   \*\*

Q. What did Defendant Lanham say in response to your statement that Josh Sester needed to be scared and needed to be moved into general population?

A. That he knew a guy down in 26 hall.

Q. Did he say what cell this was?

A. He knew a guy in 101.

Q. And were was Defendant Freeman during this conversation?

A. He was right there with us, no more than four or five foot from us.

Q. When you say that Lanham said he knew a guy in Cell 101, are you referring to an inmate?

A. Yes, sir, I am.

Q. How certain are you that Defendant Freeman was there for this conversation with Defendant Lanham?

A. 100 percent.

            \*\*   \*\*   \*\*   \*\*   \*\*

Q. What did Lanham tell you had happened on 26 hall?

A. That he had talked to Bobby Wright and he said it would be taken care of, sir.

Q. When you say "it would be taken care of," what did you think that referred to?

A. For Mr. Sester to be scared, sir.

Q. How certain are you that Defendant Lanham said that?

A. 100 percent, sir.

Q. Did you see Defendant Freeman while this conversation with Defendant Lanham was occurring?

A. Yes, sir.

Q. Where was Defendant Freeman?

A. Once again, five, six foot from us.

[*See* Record No. 91; pp. 53-58, 62.]

This testimony clearly contradicts counsel's assertion that Freeman's nod of his head was the only evidence supporting the claim that he voluntarily and knowingly joined the conspiracy.

This evidence also supports the jury's determination that Shawn Freeman possessed the specific intent to violate Joshua Sester's civil rights. Contrary to counsel's assertion, evidence was presented to the jury that Freeman was aware of the object of the conspiracy and that he knowingly and voluntarily joined and assisted in furthering its goals. Further, the evidence presented at trial established that the Defendants were aware that placing Sester in Cell 101 posed a serious risk of physical harm to him and that Freeman knew of, but disregarded this risk through the actions taken by him.

**II.     The United States Proof Was Sufficient to Establish the Essential Elements of a Violation of Sester's Civil Rights.**

As outlined in the Court's Order denying a similar motion by Defendant Lanham, the Court also disagrees with Freeman's assertion that it was erroneous to submit the issue of aggravated sexual abuse for the jury's consideration under Count 1. According to Freeman, this submission was erroneous because, "as of the date of the alleged offense (February 13-14, 2003), the term 'aggravated sexual abuse' was defined as occurring whenever one 'knowingly causes another person to engage in a sexual act . . . by force against another person . . .' or 'by threatening or placing that other person in fear that any person will be subject to death, serious bodily injury, or kidnapping . . .'" He argues that, as of the date of the offense committed against Joshua Sester, such aggravated sexual abuse had to occur in the special maritime and territorial jurisdiction of the United States or in a Federal prison. 18 U.S.C. § 2241.

However, as the United States correctly notes, Count 1 of the Indictment was brought pursuant to 18 U.S.C. § 241 and, under this section, the government has jurisdiction to enforce its provisions anywhere in the United States against anyone whose conduct meets the elements

of the statute. *See United States v. Price,* 383 U.S. 787, 805 (1966) (the "purpose and effect" of 18 U.S.C. § 241 "was to reach the assaults upon the rights under the entire Constitution"). Thus, while the Court may look to 18 U.S.C. § 2241 for the definition of "aggravated sexual abuse," that statutory section does not present a jurisdictional bar for the 2003 incident occurring in the Grant County Detention Center.

Freeman also contends that no evidence was presented from which a reasonable juror could find that the United States proved all of the essential elements of a violation of civil rights beyond a reasonable doubt. [*See* Record No. 97; pp. 9-10.] According to Freeman, the government was required to prove that the Defendants specifically intended to violate Sester's civil rights, as opposed to a general intention to punish or injure. And because Freeman had only worked at the Grant County Detention Center for only a few months prior to the February 2003 incident, he asserts that he did not know what was permissible concerning the placement of inmates and that he was unaware of the risk presented by the placement of Joshua Sester in the detention center's general population.

However, as the United States points out, Freeman's involvement and knowledge were more than his counsel represents. The jury was entitled to credit the testimony of Bobby Wright and other witnesses concerning the atmosphere of 26 hall on the night in question. Further, and contrary to Freeman's argument, the testimony of Bobby Wright establishes that Freeman not only knew of but participated in giving the instructions that Sester was to be mistreated by inmates. Under the circumstances, the jury could reasonably conclude the Defendants had the specific intent to violate Sester's Constitutional rights.

### III. Sufficient Proof Was Presented to Support the Conviction for Falsification of Records.

Freeman also argues that the evidence was insufficient to support the jury's verdict that he falsified records in violation of 18 U.S.C. § 1519. However, as noted in the United States' response, sufficient evidence was presented to the jury that Defendant Freeman made either false statements or material omissions[3] in the written statement prepared following the incident in February 2003.

Sydnor testified that, following the incident, he told Defendants Lanham and Freeman that they needed to get their stories straight. After written statements were prepared by others, Freeman submitted a report containing two false and materially misleading misstatements. First, he contended in the statement that he went down 26 hallway to do a secure check for Sydnor. However, Sydnor testified that he did not ask Freeman to check this hallway. This was materially false and misleading because Freeman attempted to use it an excuse as to why he with Lanham at Cell 101 (and not at his duty station) at the time instructions were given to Bobby Wright about the manner in which Sester was to be treated.

The statement was also false and materially misleading because it indicated that Freeman was not present while Lanham was providing instructions to Bobby Wright. Instead, it asserts that Freeman was speaking to inmates in other cells about the prior incident in Cell 102. This reference is materially false because it conceals the fact that both Freeman and Lanham were present at 101 giving instructions to Bobby Wright. Finally, the statement was given following

---

[3] *See United States v. Jackson*, 186 Fed.Appx. 736, 738 (9th Cir. 2006) (material omission is sufficient to support a conviction under 18 U.S.C. § 1519); *United States v. Weidner*, 437 F.3d 1023, 1037 (10th Cir. 2007) (an omission of a material information is sufficient to constitute a false entry under 18 U.S.C. § 1005).

instructions by Sydnor that the participants in the conspiracy needed to get their stories straight. The evidence taken as a whole supports the jury's finding that the United States proved all elements of this offense beyond a reasonable doubt.[4]

Finally, Freeman argues that he is entitled to an new trial because the evidence is against the great weight of the evidence and that the evidence "preponderates heavily against the verdict." *United States v. Pierce,* 62 F.3d 818, 825 (6th Cir. 1995). For the reasons discussed above, the Court disagrees with this assertion. While the Court may consider issues of credibility and the weight of the evidence in the context of a motion for a new trial, the undersigned does not believe that the Defendants were credible witnesses or that the key government witnesses lacked credibility. Further, the Court must conclude independently that the weight of the evidence supported the jury's verdict. With respect to his additional argument that it was error to deny his motion for a separate trial, the Court believes that this is exactly the type of conspiracy case in which a joint trial is in order.[5] Accordingly, Freeman's motion for a new trial will be denied.

---

[4] Freeman also contends that the United States failed to establish that the incident in question occurred in the Eastern District of Kentucky. At the time the United States announced that it had completed its proof, the Court called counsel to the bench to give the United States the opportunity to have the Court to take judicial notice that Grant County is located in the Eastern District of Kentucky. The Defendants did not object to this procedure. The Court does not believe that this argument merits lengthy discussion. While the United States is required to prove venue, it did so in this case.

[5] With regard to this issue, Freeman was given the opportunity to renew his motion prior to trial but failed to do so. Further, because the co-Defendant Lanham testified, nothing prohibited Freeman from seeking (unidentified) "exculpatory" evidence from him.

**IV.     Conclusion**

Having reviewed the testimony and other evidence presented during the trial of this matter, the Court cannot conclude that the jury's verdict was contrary to the evidence or that the evidence "preponderates heavily against the verdict" rendered with respect to Freeman. Accordingly, it is hereby

**ORDERED** that Defendant Shawn Freeman's motion for a judgment of acquittal and/or for a new trial [Record No. 97] is **DENIED**.

This 24th day of September, 2008.

Signed By:
*Danny C. Reeves*  DCR
United States District Judge